**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CONVERGENCE AVIATION, LTD.; IMAGE AIR OF SOUTHWEST FLORIDA, L.C., a limited liability company, d/b/a IMAGE AIR, LLC; and ONALA AVIATION, LLC., <br><br> **Plaintiffs,** <br><br> v. <br><br> UNITED TECHNOLOGIES CORP.; PRATT & WHITNEY CANADA CORP.; BBA AVIATION, PLC; DALLAS AIRMOTIVE, INC. (UK), LTD.; H+S AVIATION, LTD.; and JETPROP, LLC, <br><br> **Defendants.** | No. 10 c 2021 <br><br> Magistrate Judge Susan E. Cox |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Convergence Aviation, Ltd., Image Air of Southwest Florida, L.C., and Onala Aviation, LLC, (hereinafter collectively "plaintiffs") have claims against six defendants for property damage to an aircraft that crashed due to engine failure.[1] Plaintiffs allege defendants were involved in either the manufacturing, overhauling, or servicing of the aircraft. But only one of those defendants is at issue here: BBA Aviation, PLC ("BBA"). BBA has filed a motion to dismiss for lack of personal jurisdiction, claiming that it is a holding company with no customers in Illinois, no employees, and no physical assets or offices in Illinois. Though BBA asserts that it was not involved in the overhaul of the damaged aircraft, plaintiffs argue BBA directly serviced and overhauled the engine on December 15, 2005. Counts XXIII through XXVII of plaintiffs' complaint are directed

---

[1] Pls' Amended Compl., dkt. 39.

at BBA. For the reasons set forth, BBA's motion to dismiss is granted [dkt. 213].

**I.     Background**

In 2002 plaintiff Convergence Aviation, ltd, purchased the aircraft at issue, a Piper Malibu PA-46. Months later the aircraft was converted to a Piper DLX-JetProp by installing a new engine. After it experienced engine failure, plaintiffs allege that it was overhauled by three of the defendants that are purported agents or alter-egos of BBA: Dallas Airmotive, Inc. ("Dallas"); H+S Aviation, Ltd. ("H+S"); and, Pratt & Whitney Canada Corporation("Pratt"). All of these defendants together are referred to as the "Dallas defendants" and all four of them are implicated in the overhaul of the engine that took place on December 15, 2005.

Years later, on January 8, 2008, the engine again experienced problems. The plane left Ocala, Florida and was en route to Bloomington, Illinois when the plane's engine experienced an extreme temperature rise.[2] The pilot was required to shutdown the engine in-flight and was unable to restart it thereafter. The pilot declared an emergency landing in Bowling Green, Kentucky.[3] During the final approach, the propeller came out of feather and, as a result, the pilot was unable to reach the runway.[4] The plane impacted the ground and caused substantial damage to the hull and the engine. Plaintiffs now claim that as a direct result of the service and repair of the engine by the Dallas defendants, the aircraft crashed on December 15, 2005.

**II.    Legal Standard**

Personal jurisdiction determines, in part, where a plaintiff may sue a defendant. Once a defendant moves to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), as BBA is doing here, "the plaintiff bears the burden of demonstrating the existence of

---

[2]*Id.*
[3]*Id.* at ¶23.
[4]*Id.* at ¶24.

jurisdiction."[5] We may consider matters outside of the pleadings, but a determination based on the submission of written materials, without an evidentiary hearing, requires the plaintiff to make a *prima facie* case of personal jurisdiction.[6]

Here, the jurisdictional inquiry begins with an application of the statutory law of the forum state, the Illinois long-arm statute.[7] Because the Illinois long-arm statute is now "coextensive with the due process requirements of the United States Constitution," as long as the contacts between the defendant and Illinois "'are sufficient to satisfy the requirements of due process, then the requirements of both the Illinois long-arm statute and the United States Constitution have been met, and no other inquiry is necessary.'"[8]

There are two forms of personal jurisdiction: general or specific. General jurisdiction is found where a defendant's contacts with the state are continuous and systematic,[9] so that "it can be sued in the forum state for any cause of action arising in any place."[10] Specific jurisdiction is found where a defendant has more limited contacts with the forum state, in which case "the plaintiff must show that its claims against the defendant arise out of the defendant's constitutionally sufficient contacts with the state."[11] In other words, specific jurisdiction looks to whether a defendant has "purposefully directed" activity at residents of the forum and if there are injuries that "arise out of or relate to" that activity.[12] Under either test, the standard remains that a defendant must have

---

[5] *Jennings v. AC Hydraulic A/S,* 383 F.3d 546, 548 (7th Cir. 2004).
[6] *uBid, Inc. v. GoDaddy Group, Inc.,* 623 F.3d 421, 423 (7th Cir. 2010).
[7] *See Jennings,* 383 F.3d at 548.
[8] *Klump v. Duffus,* 71 F.3d 1368, 1371 (7th Cir. 1995)(quoting *L.B. Foster Co. v. Railroad Serv., Inc.,* 734 F.Supp. 818, 822 (N.D. Ill. 1990)).
[9] *See Goodyear Dunlop Tires Operations, S.A. v. Brown,* ___ U.S. ___ , 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011).
[10] *uBid, Inc.,* 623 F.3d at 425.
[11] *Id.*
[12] *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

"'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[13]

**III. Analysis**

To prevail under either theory of jurisdiction, plaintiffs must show an exception to the general rule that the "jurisdictional contacts of a subsidiary corporation are not imputed to the parent."[14] Personal jurisdiction will not be found where "corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary."[15] In Illinois, courts exercise jurisdiction over parent companies based on their subsidiaries' activities "where the corporate veil can be pierced, or perhaps where all the corporate formalities are observed but the subsidiary's only purpose is to conduct the business of the parent."[16] The latter is what plaintiffs are asking us to consider: whether BBA is so closely linked to its subsidiaries to create jurisdiction. If the subsidiaries were acting as BBA's Illinois agent, in essence conducting BBA's business rather than their own, then BBA can rightfully be sued.[17]

**A. Relationship Between BBA and Its Subsidiaries**

To make that determination, plaintiffs urge us to look to a seminal case in Illinois that examined the nature of a subsidiary's activities and the degree of control exercised by the parent, *Maunder v. DeHavilland Aircraft of Canada, Ltd..*[18] In that case the parent corporation was an aircraft manufacturer in Canada, and the wholly owned subsidiary a Delaware corporation with its principal place of business in Illinois. The subsidiary's sole business was to sell the parent

---

[13]*Id.*(quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).
[14]*See Purdue Research Foundation v. Sanofi-Synthelabo, S.A.,* 338 F. 3d 773, 788 n. 17 (7th Cir. 2003).
[15]*Central States, Southeast and Southwest Areas Pension Fund v. Feimer Express World Corp.,* 230 F.3d 934, 943 (7th Cir. 2000).
[16]*Central States, Southeast and Southwest Areas Pension Fund,* 230 F.3d at 940.
[17]*IDS Life Ins. Co. V. SunAmerica Life Ins. Co.,* 136 F.3d 537, 541 (7th Cir. 1998).
[18]102 Ill.2d 342, *cert. denied,* 469 U.S. 1036 (1984).

company's aircraft parts, all of its stock was owned by the parent, the parent paid the salaries of the subsidiary's directors, and the parent guaranteed the subsidiary's lease.[19] The subsidiary was also controlled by the parent company's Vice President of sales.[20] Under these circumstances, the Illinois Supreme Court held that the parent was "[c]learly...doing business in Illinois."[21]

Citing to that case, plaintiffs then apply a set of factors to conclude that BBA, as the parent company, is so closely linked to its subsidiaries to create jurisdiction. These factors - in some form or another - have been used by several courts in this district and are as follows:

> whether the parent arranges financing for and capitalization of the subsidiary;
> whether separate books, tax returns and financial statements are kept;
> whether officers or directors are the same;
> whether the parent holds its subsidiary out as an agent;
> the method of payment made to the parent by the subsidiary; and
> how much control is exerted by the parent over the daily affairs of its subsidiary.[22]

We begin our analysis with *Maunder*, and the factors outlined above, as our guide.

**Whether BBA arranges financing and capitalization of its subsidiaries**

Plaintiffs first attempt to argue that any amount of financing or capitalization arranged by the parent company for its subsidiaries is sufficient to turn this factor in favor of imputing control and, therefore, personal jurisdiction. This is simply not correct. The case plaintiffs cite does not stand for this proposition and we find no case in this district that has held as such. The proper analysis requires us to look to the extent, if any, that BBA arranges for its subsidiaries' financing.

Plaintiffs then refer to the deposition of Daniel Marcinik, the head of tax for BBA, who was

---

[19] *Maunder,* 102 Ill.2d at 346.
[20] *Maunder,* 102 Ill.2d at 346-47.
[21] *Id.* at 352.
[22] *Graco, Inc. v. Kremlin, Inc.*, 558 F.Supp. 188, 191 (D.C.Ill.1982); *Gruca v. Alpha Therapeutic Corp.,* 19 F.Supp.2d 862, 867 (N.D. Ill. 1998)(applying the factors outlined in *Graco, Inc.*); *see also Montalbano v. HSN, Inc.,* 2011 WL 3921398, *3 (N.D. Ill. 2011)(noting a slightly different set of seven factors to be used when considering whether a parent corporation is doing business in Illinois through its subsidiary).

asked whether BBA arranges for financing and capitalization of its subsidiaries. Mr. Marcinik responded that yes, BBA arranges bank facilities for its subsidiaries.[23] He further testified that its subsidiaries cannot obtain their own financing without consent from BBA.[24]

BBA does not dispute this but refers to *Bray v. Fresenius Medical Care Aktiengesell-Schatf, Inc.*[25] where the parent company denied that it controlled its subsidiaries' financing, but admitted that its "operating segments" did not control financing because financing had to be approved by a management board.[26] The *Bray* court found that this factor could weigh in favor of a finding of substantial control, except that the plaintiffs failed to show in what specific ways the parent company controlled the financing decisions of its subsidiaries.[27]

Though plaintiffs have not submitted specific documents to demonstrate BBA's substantial control over its subsidiaries' financing, such as a "consolidated financial report" or BBA's full "Annual Report,"[28] we know that the subsidiaries cannot obtain their own financing. This factor arguably shows some level of control by BBA.

Plaintiffs' assertion that BBA must approve all purchases made by its subsidiaries, however, does not weigh into this analysis. The testimony by Zillah Stone, Group Secretary to BBA, is clear that BBA's approval is needed only when the subsidiary's purchase is "sufficiently large and sufficiently unusual...[to] require shareholder approval."[29]

**Whether BBA and its subsidiaries keep separate financial statements**

---

[23] Pl's resp., Exh. C, p. 63-64, dkt. 235.
[24] Pl's resp., Exh. C, p. 63-64, dkt. 235.
[25] 2007 WL 7366260 (N.D. Ill. 2007).
[26] 2007 WL 7366260 at *7.
[27] *Id.* at *8.
[28] *Id.*(finding that plaintiff did not submit parent company's "consolidated financial report" and only submitted brief portions of parent company's "Annual Report," which was insufficient to show substantial control).
[29] Pl's resp., Exh. E, pp. 58, dkt. 235.

Plaintiffs argue that BBA and its subsidiaries do not keep separate financial statements, and BBA claims that they do. Plaintiffs again refer to the deposition of Ms. Stone, who is both Group Secretary to BBA and a member of the BBA executive management committee.[30] She testified that the subsidiaries of BBA "report their financial results up to the holding company and those financial results are then consolidated into group accounts."[31] BBA admits that BBA consolidates financial reports of all its subsidiaries, but claims that each subsidiary still has its own financial records and each prepares its own budget.[32] In support, BBA refers to Iain Simm's declaration, BBA's Group General Counsel. Mr. Simm states that "BBA and its subsidiaries maintain their own separate accounting and financial records. But for the purpose of public reporting, as in BBA's annual report, the financial results and other pertinent information are reported in a consolidated manner."[33]

Then plaintiffs argue that the subsidiaries do not generate their own annual reports, which is supported by Mr. Marcinik's deposition testimony where he states that the subsidiaries do not create them because there is "no requirement" for them to do so.[34] BBA refers us to that same testimony. We agree that the subsidiaries have no obligation to perform a non-existent requirement.

Plaintiffs also note that BBA's annual report includes the phrase "[o]ur people" and uses the term "we," which is inclusive of the subsidiary businesses. According to Mr. Marcinik, the "our people" refers to all BBA employees and its subsidiaries' employees, and the "we" is a "generic term" referring to the "trading businesses," or subsidiaries.[35] Plaintiffs, therefore, assert that this is more evidence of the control BBA has over its subsidiaries.

---

[30] Pl's resp., Exh. E, pp. 11, 20, dkt. 235.
[31] Pl's resp., Exh. E, p. 32, dkt. 235.
[32] Pl's resp., Exh. C, pp. 64-65, dkt. 235.
[33] Def's Reply, Exh. D, ¶8, dkt. 243.
[34] Pl's resp., Exh. C, p. 74, dkt. 235.
[35] Pl's resp., Exh. C, pp. 75-78, dkt. 235.

BBA cites *Gruca v. Alpha Therapeutic Corporation,* where the court found that "ambiguous references to '[*o]ur* key overseas operation,' '*our* international marketing efforts' and '*our* marketing position'" were consistent with the subsidiaries existence as a separate entity.[36] In that case, the court found that the annual report's use of the word "our" did not, in itself, show the subsidiary as merely "an instrument for marketing and selling [the parent company's] products" because the report sufficiently identified the subsidiary as a separate entity in other portions of the document.[37]

Here, we cannot make the same comparison. The excerpt of BBA's annual report that plaintiffs attach is unreadable, and even if we could make out the text, it is only one page of the report. With this limited information we are not willing to conclude that the words "our" and "we" reflect pervasive corporate control.[38]

**Whether officers and executives are the same between BBA and its subsidiaries**

Plaintiffs contend evidence of control is found in BBA's Executive Management Committee, which is comprised of BBA senior executives and managers "drawn from across the businesses and functions of BBA and its subsidiaries."[39] Plaintiffs specifically list five individuals they believe show overlap between BBA and its subsidiaries: (1) Simon Pryce, who is a member of BBA's board of directors, a chief executive for BBA Aviation Group, and a member of BBA's Executive Management Committee; (2) Mark Hoad, who is a member of BBA's board of directors, a finance

---

[36] 19 F.Supp.2d at 867.
[37] *Gruca,* 19 F.Supp.2d at 868.
[38] *See also LaSalle Nat.'l Bank v. Vitro, Sociedad Anonima,* 85 F.Supp.2d 857, 865 (N.D. Ill. 2000)(finding that "[p]ersonal jurisdiction is based on actual evidence of control...rather than on a corporation's general descriptions.").
[39] Pl's resp., Exh. D, ¶9, dkt. 235.

director for BBA Aviation Group, and a member of BBA's Executive Management Committee; (3) Hugh McElroy, who is manager of BBA ERO, president of the subsidiary Dallas, and a member of BBA's Executive Management Committee; (4) Nandu Madireddi, who is an executive at Dallas but had business expenses paid by BBA; and (5) Daniel Marcinik, who is an employee of BBA US Holdings but designated by BBA to testify regarding the relationships between BBA and its subsidiaries.

First, BBA explains that the Executive Management Committee is not the controlling arm of BBA's subsidiaries but, rather, designed only to expedite the sharing of information amongst the various subsidiaries. BBA also explains that membership on the committee does not confer status as an officer, director, or agent. This explanation is supported by Mr. Simm, BBA's Group General Counsel, who is also a member of the Committee.[40] Plaintiffs have provided us no reason to question Mr. Simm's account of the Committee's purpose.

BBA also claims that the only individual, out of the five, who has any relevance to this argument is Mr. McElroy because he is both a member of BBA's Executive Management Committee and president of one of the subsidiaries at issue. But, again, BBA argues that Mr. McElroy's role in both capacities still fails to show how he has - at the direction of BBA - substantially controlled Dallas.

We find that despite the overlaps pointed out by plaintiffs, these examples do not approach the level of control found in *Maunder*.[41] As BBA argues, like in *Gruca* where the majority of the subsidiary's directors were also directors of the parent company, the court still found insufficient

---

[40] Pl's resp., Exh. D, ¶9, dkt. 235.
[41] *See Integrated Business Info Service Limited v. Dun & Bradstreet Corp.,* 714 F.Supp. 296, 300 (finding that an overlap of executives and directors still did not approach the level of control in *Maunder).*

evidence that the parent's directors controlled the subsidiary.[42] We too find these intertwined relationships, on their own, insufficient to show substantial control.

**Whether BBA holds its subsidiaries out as its agents**

Plaintiffs argue that because BBA has a mandatory branding policy that applies to BBA and all of its subsidiaries, it is holding its subsidiaries out to shareholders and the public as its agents. BBA does not dispute that its subsidiaries must use the BBA Aviation logo on their communications. But BBA cites to case law on this issue, unlike plaintiffs. The Seventh Circuit has articulated that a "corporate parent may provide administrative services for its subsidiary in the ordinary course of business without calling into question the separateness of the two entities for purposes of personal jurisdiction."[43] Put another way, that court held that "a mere fax legend is insufficient to show either that corporate formalities were not substantially observed or that [the parent] controlled [the subsidiary] to an unusually high degree."[44] With that, and Mr. Simm's sworn statement that the subsidiaries are not the agents of BBA, and are not able to bind BBA, this factor does not evidence substantial control.

**The method of payment made to BBA by the subsidiaries**

Under this factor plaintiffs assert that "inter-company" payments are demonstrative of BBA's control and the subsidiaries lack of autonomy. Plaintiffs first claim that BBA redistributes profits generated between the subsidiaries to other subsidiaries. But we do not find any support for that position, nor do plaintiffs provide any. BBA claims that the handling of subsidiary profits is consistent with its status as a holding company. BBA then argues that consolidation of subsidiaries'

---

[42] *Gruca,* 19 F.Supp.2d at 870 (holding that such overlap provided some evidence of control, or potential for it, but on its own was not sufficient).
[43] *Central States, Southeast and Southwest Areas Pension Fund,* 230 F.3d at 945.
[44] *Id.*

financial reports and stock ownership by the parent company do not necessarily confer jurisdiction. This is true.[45]

Second, plaintiffs assert that dividends are not paid to BBA's shareholders. Our review of Mr. Marcinik's deposition, BBA's head of tax, shows that the subsidiaries generate income that yields profits, which *can* be used to pay dividends to shareholders of BBA.[46] Mr. Marcinik explained that dividends have "not been paid by any of the US companies in many years," but related that to a question of tax treatment, not structure.[47] We find plaintiffs limited discussion on this factor does not demonstrate BBA's substantial control over its subsidiaries.

**The amount of control exerted by BBA over the daily affairs of the subsidiaries**

Plaintiffs argue that several actions on the part of BBA demonstrate its day-to-day control over its subsidiaries. First, Plaintiffs note that BBA's website claims that it exercises "internal controls" over its subsidiaries. For example, plaintiffs refer to the website's mention of a finance manual, which provides accounting policies for all subsidiaries, BBA's audit committee, which monitors and enforces subsidiaries' compliance with BBA's policies, and BBA's control of capital expenditure.[48] Plaintiffs have provided no additional argument regarding these listed "controls" as they appear on the website, and how they evince an "unusually high degree of control"[49] over its subsidiaries.

In response, BBA claims these to be standard controls for any holding company. Both parties

---

[45]*See SGI Air Holdings II, LLC v. Novartis Intern., AG,* 192 F.Sup.2d 1195, 1199 (D. Colo. 2002) (stating that the business of a holding company is to hold the stock of the subsidiaries and derive profits therefrom, and stock ownership alone does not support an agency relationship or personal jurisdiction); *see also Gruca,* 19 F.Supp.2d at 870 (noting that a subsidiary is not merely an instrument of the parent company where the subsidiary maintains its own financial records and keeps its own books).
[46]Pl's resp., Exh. C, p. 67, dkt. 235.
[47]Pl's resp., Exh. C, pp. 67-68, dkt. 235.
[48]Pl's resp., Exh. K, dkt. 235.
[49]*Central States, Southeast and Southwest Areas Pension Fund,* 230 F.3d at 943.

again cite to Ms. Stone's testimony, BBA Aviation's Group Secretary, that certain spending controls exist to limit the subsidiaries' ability make purchases without BBA approval.[50] But as BBA clarifies, Ms. Stone stated that BBA approval is only needed for purchases "if they are sufficiently large and sufficiently unusual..." such as the purchase of a "significant business" where shareholder approval would be required.[51] Ms. Stone also commented on employment contracts "that are of an unusual nature" and those where the "notice period is longer than a year."[52] She testified that those types of contracts would fall within the BBA spending controls.[53] So BBA does not dispute that it has controls over its subsidiaries, in certain respects, but it distinguishes these activities from day-to-day decisions, which are independently made by subsidiaries.

Plaintiffs then argue that even day-to-day business operation is run by BBA. Plaintiffs cite to at least 12 policy manuals written by BBA that apply to it and its subsidiaries. Plaintiffs argue that compliance with these policies and procedures is mandatory. Though plaintiffs do not provide much more than a list of policies, we assume they believe them to show, on their face, substantial control. A closer look at the policies shows they are indeed "obligatory" and apply to all "subsidiaries and affiliates."[54] But, for example, the Code of Ethics policy covers topics like compliance with "laws, rules and regulations," including competition, anti-trust and anti-monopoly laws, insider trading, and non-discrimination laws.[55] As noted by BBA, it has not subjected itself to jurisdiction simply by requiring its subsidiaries to comply with laws. The same can be said for BBA's policies on

---

[50]Pl's resp., Exh. E, p. 58, dkt. 235.
[51]Pl's resp., Exh. E, p. 58, dkt. 235.
[52]*Id.*
[53]*Id.*
[54]Pl's resp., Exh. L, p. 1, dkt. 235.
[55]Pl's resp., Exh. L, pp. 3-11, dkt. 235.

competition,[56] anti-harassment,[57] bribery,[58] and unethical behavior.[59]

**Joint sponsorship of promotional activities**

This factor warrants limited discussion. Plaintiffs' arguments under this factor have already been addressed: BBA's requirement that subsidiaries use its logo and BBA's branding policy that applies to all subsidiaries. As noted, this minimal evidence does not support the idea that BBA is doing business through its subsidiaries. And the use of a logo on letterhead, as we have already addressed, is not jurisdiction-conferring conduct.

**Meeting sites of subsidiary's board of directors**

Plaintiffs claim that because they have found no evidence that Dallas and H+S have their own boards of directors, they act through BBA's Executive Management Committee. In other words, then, BBA controls the subsidiaries through its Executive Management Committee, which meets in the United States despite BBA being headquartered in London. But BBA responds that these subsidiaries do, in fact, have their own boards of directors. BBA explains that plaintiffs just failed to ask this question in discovery.[60]

**Prosecution of trademark infringement suits**

Plaintiffs argue that the subsidiaries can prosecute trademark infringement suits in BBA's name. Plaintiffs claim that this is evidence of jurisdiction-conferring behavior, or should be inferred to be, because BBA failed to tender a verification addressing this subject. But BBA refers us directly to its verified discovery response that "Dallas Airmotive, Inc. And H+S Aviation, Ltd....own

---

[56]Pl's resp., Exh. N, dkt. 235.
[57]Pl's resp., Exh. O, dkt. 235.
[58]Pl's resp., Exh. Q, dkt. 235.
[59]Pl's resp., Exh. S, dkt. 235.
[60]Pl's resp., Exh. C, p. 69, dkt. 235. (Our review of Mr. Marcinik's deposition testimony shows that he was, in fact, asked if the subsidiaries have their own separate boards. He responded that they do.).

and manage their intellectual property and alone are able to prosecute their infringement cases."[61] With that, no further discussion is necessary.

**Subsidiaries names and addresses in BBA advertising**

There is essentially no dispute that BBA does not advertise.[62] But as plaintiffs see it, BBA markets itself and its subsidiaries through its website. Plaintiffs believe that this exhibits BBA's control over its subsidiaries. To the contrary, we cannot assume jurisdiction merely because BBA lists these two companies on their website. And though plaintiffs seem to agree, it bears noting that BBA's inclusion of its subsidiaries' contact information alone does not constitute advertising.

Out of the ten factors analyzed, only one weighs in favor of BBA's substantial control over its subsidiaries, and that is BBA's control over financing for its subsidiaries. But one factor is a tenuous link, with only Mr. Marcinik's testimony that the subsidiaries require consent from BBA to obtain financing. That alone is not jurisdiction-conferring activity. We acknowledge an overlap of a few subsidiary employees and BBA's Executive Management Committee but, again, courts in this district have addressed similar circumstances and found that some overlap does not show an unusually high degree of control.[63] The purpose of the committee is also important in the analysis, in that its role is principally to share information, not direct the day-to-day management of its subsidiaries.[64] If we compare this case to *Maunder,* as plaintiffs suggest - where the subsidiary's sole

---

[61] Def's Reply, Exh. E, dkt. 243.
[62] Pl's Resp., Exh. E, p. 38, dkt. 235.
[63] *See Gruca,* 19 F.Supp.2d at 870; *Bray,* 2007 WL 7366260, *8.
[64] *See City of Greenville v. Syngenta Crop Protection, Inc.,* No. 10-188, 2011 WL 5877239, *13 (S.D. Ill., Nov. 23, 2011)(finding the executive committee, where two members were also members of the five-member board of directors, was evidence of control by the parent company because it made decisions in "strategic business planning, budgeting, product testing, production levels, marketing, sales and personnel" that the subsidiary was required to adopt).

business was to sell the parent company's aircraft parts, all of its stock was owned by the parent, the parent paid the salaries of the subsidiary's directors, and the parent guaranteed the subsidiary's lease - the jurisdictional contacts of BBA's subsidiaries cannot be imputed to BBA.[65] BBA and its subsidiaries observe corporate formalities, and there is no evidence that BBA controls its subsidiaries' staffing, marketing, sales, or pricing decisions. The subsidiaries also create their own budgets and maintain separate books and bank accounts.[66] Mr. Marcinik testified that the subsidiaries submit their budgets to BBA for approval, but there is no evidence that BBA exercises veto over the budget, only that a budget that does not meet BBA's expectations may require the subsidiary to offer an explanation.[67] After reviewing each factor, nothing shows that BBA is involved in the day-to-day business of Dallas or H+S.[68] The various website excerpts cited by plaintiffs also fail to contradict Mr. Simm's sworn statement that the terms "BBA" or "BBA Group" or "BBA Aviation" are used as shorthand descriptions of the entirety of its holdings,[69] that the subsidiaries maintain their own separate accounting and financial records,[70] and that BBA's subsidiaries are not agents of BBA nor are they able to contractually bind BBA.[71] With that, we reject that BBA exists "for no purpose other than conducting the business of" Dallas or H+S.[72]

## B. General Jurisdiction

---

[65] *See* 102 Ill.2d at 346.
[66] *See* Pl's Resp., Exh. C, p. 68, dkt. 235 (testimony from Mr. Marcinik that each subsidiary has its own CFO, controller, and accountants).
[67] Pl's Resp., Exh. C, p. 65-66, dkt. 235; *see also Gruca,* 19 F.Supp.2d at 870 (finding that subsidiary did not provide evidence that parent company prepared the budget or had veto power over it).
[68] *See Bray,* 2007 WL 7366260 at *8 (outlining controls by the subsidiary).
[69] Pl's Resp., Exh. D, ¶6, dkt. 235.
[70] Pl's Resp., Exh. D, ¶8, dkt. 235.
[71] Pl's Resp., Exh. D, ¶10, dkt. 235.
[72] *See Old Orchard Urban Limited Partnership v. Harry Rosen, Inc.,* 389 Ill.App.3d 58, 65 (1st Dist. 2009)(stating that the critical question is "whether the Illinois subsidiary exists for no purpose other than conducting the business of its parent.").

Plaintiffs proffer the same argument here as that analyzed above: they do not believe BBA is a holding company. The test for general jurisdiction requires plaintiffs to show that BBA has contacts with Illinois that are so substantial it is "constructively present in the state."[73] Plaintiffs argue that BBA is more than a holding company, it is an "aviation services group" that acts through its subsidiaries (Dallas and H+S), and those companies maintain sufficient contacts with the State.

We have already determined that the factors demonstrate sufficient separation between BBA and its subsidiaries. For purposes of general jurisdiction too, we find that BBA does not have the "continuous and systematic" contact with Illinois that is required. BBA is an entity organized under the laws of England, it is headquartered in London, it is not registered or authorized to transact business in Illinois, and it has no employees or business customers in Illinois. Its subsidiaries may have submitted to jurisdiction in Illinois, but it has not. For purposes of this analysis, we find that a company "that has no offices or sales in Illinois is not like a resident firm and so is not within the reach of [Illinois' long-arm statute]."[74]

### C. Jurisdictional Discovery

Plaintiffs also filed their fourth motion to compel jurisdictional discovery at the same time that the parties were briefing BBA's motion to dismiss [dkt. 233]. We ruled that we would take up the issue of discovery with BBA's motion, and allow plaintiffs to supplement the record if there was indeed missing information. We have found none.

In their motion, plaintiffs acknowledge that the documents thus far produced, and the testimony elicited, is sufficient to demonstrate a basis to assert jurisdiction over BBA. Plaintiffs simply believe that probative documents still exist that BBA did not produce. Plaintiffs list over 50

---

[73] *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir.2003).
[74] *IDS Life Ins. Co.*, 136 F.3d at 541.

"general" items that BBA should have produced, including "letters, correspondence, memoranda, contracts, agreements, letter agreements, news releases, notices, reports, bulletins, newspapers" and then outline 16 specific deficiencies in BBA's production. Despite numerous hearings on the issue of jurisdictional discovery, and the Court ordering BBA to produce and verify production as to many of these alleged deficiencies, plaintiffs still believe they have been stonewalled in their efforts.

What seems more true is plaintiffs' hope that additional discovery will reveal some act by BBA that evinces definitive control over one of its subsidiaries. Plaintiffs have been allowed ample discovery on jurisdiction and the answer is clear: BBA exercises a certain degree of control over Dallas and H+S, as "[p]arents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent."[75] But the control shown does not show "day-to-day management control" over either Dallas or H+S.[76] And in our view, the additional discovery plaintiffs seek will not demonstrate the kind of control necessary to find that Dallas and H+S are conducting BBA's business instead of their own.[77]

We have also been through an extensive discussion on jurisdictional discovery before. The Court spent considerable time with the parties in response to plaintiffs' last motion to compel because the motion itself did not specify what was lacking in BBA's production. During the hearing on the motion we went through each of plaintiffs' requests, individually, and the Court ruled on the necessary action BBA needed to take. For example, we addressed plaintiffs' request for information on insurance. We required BBA to verify its response that BBA uses risk management brokers to secure insurance and that the subsidiaries then pay a pro rata portion of any premium, and it has

---

[75] *IDS Life Ins. Co.,* 136 F.3d at 540.
[76] *See Central States, Southeast and Southwest Areas Pension Fund,* 230 F.3d at 945.
[77] *See IDS Life Ins. Co.,* 136 F.3d at 541 (noting the requisite standard to impute control by the parent company).

done that.[78] Without more, plaintiffs' general desire to inquire further on the issue of insurance is unnecessary. Plaintiffs also had a general request for emails between BBA and its subsidiaries. We noted that not every email between someone at BBA and one of their subsidiaries would be relevant.[79] Such a broad request was denied, but we asked plaintiff to provide a more narrow request that related, at least potentially, to BBA's control of its subsidiaries. Plaintiffs additionally requested information on internal audit infractions of Dallas and H+S, which we required BBA to provide. It has verified its answer that none exist. Plaintiffs cannot expect more.

Those are just a few of the examples from the protracted jurisdictional discovery journey we have taken with both sides. We have said it before; the only relevant question is "what the parent company does vis-a-vis the subsidiary."[80] Despite plaintiffs' desire for more documents, BBA has provided verified responses to requests and BBA's witnesses have already responded to the relevant questions. We find, therefore, no need for further discovery.

## IV. Conclusion

Our analysis finds that Dallas and H+S are not so controlled by their parent company BBA to allow us to exercise personal jurisdiction over it, as a nonresident party. BBA's motion to dismiss for lack of personal jurisdiction is granted [dkt. 213]. Those portions of the complaint directed at BBA - Counts XXIII through XXVII - are hereby dismissed. Plaintiffs' fourth motion to compel jurisdictional discovery is denied [dkt. 233].

**IT IS SO ORDERED.**

---

[78] Def's Resp. to Mt to Compel, Exh. 1, Transcript of Oral Argument at 33, Nov. 2, 2011; *see also* Exh. 2, ¶E, dkt. 240.
[79] *See* Def's Resp. to Mt to Compel, Exh. 1, Transcript of Oral Argument at 23-24, Nov. 2, 2011, dkt. 240.
[80] *See* Def's Resp. to Mt to Compel, Exh. 1, Transcript of Oral Argument at 44, Nov. 2, 2011, dkt. 240.

**ENTERED**: February 29, 2012

_____
Susan E. Cox
U.S. Magistrate Judge