UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CONVERGENCE AVIATION, LTD.; and ONALA AVIATION, LLC., <br><br> Plaintiffs, <br><br> v. <br><br> PRATT & WHITNEY CANADA CORP.; <br><br> Defendant. | No. 10 c 2021 <br><br> Magistrate Judge Susan E. Cox |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Convergence Aviation, Ltd. and Onala Aviation, LLC, (hereinafter collectively "plaintiffs") originally had claims against six defendants for property damage to an aircraft that crashed due to engine failure.[1] After several years of litigation, only four counts remain against a sole defendant: Pratt & Whitney Canada Corporation. Here, defendant has filed a motion for summary judgment on one of those counts, Count IV, which alleges spoliation of evidence. Defendant argues both that this claim is barred under the economic loss doctrine - known as the Moorman doctrine in Illinois - and that this claim cannot survive because the law requires a concurrent products liability claim to present a spoliation claim. We find that Count IV is not barred by the Moorman doctrine and the claim does not fail on a procedural basis because we hereby grant plaintiffs' request to re-plead their products liability claim [dkt. 327].

**I.   Background**

In 2002 plaintiff Convergence Aviation, ltd, purchased the aircraft at issue, a Piper Malibu PA-46. Months later the aircraft was converted to a Piper DLX-JetProp by installing a new engine.

---

[1] Pls' Amended Compl., dkt. 39.

The aircraft experienced engine failure while in-flight, attempted an emergency landing, but struck the ground damaging the hull of the aircraft as well as the engine.[2] On February 20, 2008, the engine and certain accessories were removed from the aircraft and sent to a defendant facility as part of a government supervised investigation into the accident.[3] For a nearly seven month period, defendant conducted a teardown of the engine, at the direction of the Canadian Transportation Safety Board, and produced a report summarizing its findings.[4] Following the teardown, the engine and accessories remained in defendant's possession. Plaintiffs allege that they worked with defendant to potentially place the engine back in service, while emphasizing that the engine should not be overhauled because of the potential for a subrogation action by the insurers.[5] Plaintiffs, however, learned that the engine was in fact overhauled sometime prior to January 14, 2009.[6]

One year later, plaintiffs filed 27 counts against several defendants. Since that time, plaintiffs have voluntarily dismissed all but one defendant and abandoned certain claims, leaving the following counts against defendant Pratt & Whitney Canada Corporation: Conversion; Bailment (Counts II and III) and; Negligent Spoliation of Evidence (Count IV).

**II.  Argument**

At issue here is Count IV of plaintiffs' complaint, where they allege that defendant "negligently destroyed, lost, misplaced, disposed of, or otherwise failed to preserve the engine's accessories following their removal from the subject aircraft." Plaintiffs also claim that as a direct and proximate result of defendant's actions, plaintiffs are not able to prove the necessary elements

---

[2]Pls' Second Amended Compl., dkt. 303, ¶13.
[3]Pls' Second Amended Compl., dkt. 303, ¶14.
[4]Pls' Second Amended Compl., dkt. 303, ¶15.
[5]Pls' Second Amended Compl., dkt. 303, ¶47.
[6]Pls' Second Amended Compl., dkt. 303, ¶17.

of their negligence, strict product liability, breach of express warranty, breach of warranty, and breach of contract claims against defendant.[7]

Defendant argues two bases for dismissal of Count IV: first, that the products liability claim plaintiffs claim they "lost" due to spoliation could not have been maintained in the first instance because it is barred by the Moorman doctrine, and; second, that procedurally Count IV fails because plaintiffs dismissed their underlying products liability claim.

### A. Moorman Doctrine

We begin with defendant's argument under the Moorman doctrine. This doctrine "bars recovery in tort for purely economic losses arising out of a failure to perform contractual obligations."[8] The Illinois Supreme Court has explained that when the "'defect is of a qualitative nature and the harm relates to the consumer's expectation that a product is of a particular quality so that it is fit for ordinary use, contract, rather than tort, law provides the appropriate set of rules for recovery.'"[9] But the Moorman Doctrine, of course, comes with exceptions: one being the doctrine does not apply where a sudden or dangerous occurrence causes personal injury or property damage.[10] Defendant anticipated the application of this exception in its motion and plaintiffs, indeed, rely on it.

There appears to be no dispute that the in-flight engine emergency and the crash landing that followed was a "sudden and dangerous occurrence" for purposes of the exception. But the question is whether that sudden occurrence caused damage to *other* property, in addition to the product

---

[7]Pls' Second Amended Compl., dkt. 303, ¶54.
[8]*Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 567 (7th Cir. 2012).
[9]*Haimberg v. R & M Aviation, Inc.,* 5 Fed. Appx. 543, 547 (7 Cir. 2001) (quoting *Moorman Mfg. Co. v. Nat'l Tank Co.,* 435 N.E.2d 443, 451 (1992)).
[10]*Mars, Inc. v. Heritage Builders of Effingham, Inc.,* 327 Ill. App. 3d 346, 351 (4th Dist. 2002).

itself.[11] Defendant argues that the conversion of the aircraft was as one integrated product, whereas plaintiff claims that the airframe and the engine were not one single unit for purposes of the Moorman doctrine, but were two separately bargained for parts. Plaintiffs explain that they only bargained to have a new engine (made by defendant) installed in its aircraft, not an airframe.

The law on this point is clear that "a product that damages only itself cannot be the subject of a suit for damages."[12] We must, then, determine whether the engine was other property for purposes of Moorman. In several cases addressing this question, "the critical fact of the inquiry has been whether the damaged property was part of an integrated system, such that the damaged property could not be separated from the 'product.'"[13]

The parties principally look to one case, also involving a defendant aircraft engine: *Trans States Airlines v. Pratt & Whitney Canada, Inc.*[14] There, the same question was addressed by the Illinois Supreme Court, which was whether the engine and its airframe constituted two separate products.[15] There, an aircraft manufacturer bought an airplane engine from the defendant and incorporated it into one of its airframes.[16] While the aircraft was flying, the engine failed and caught fire.[17] There was damage to not only the engine, but also the surrounding airframe.[18] The plaintiff in that case was the lessor of the aircraft and filed suit for the engine repairs, as well as the airframe repair costs. Like here, the plaintiff argued that the engine was a separate entity from the airframe -

---

[11]*Id* at 354 (noting that damage to "*any* property is not sufficient; the property must be 'other property,' extrinsic from the product itself.").
[12]*Id (citing Moorman Mfg. Co. v. Nat'l Tank Co.,* 435 N.E.2d 443, 450).
[13]*Id* at 355 *(citing, e.g., East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 867-68 (1986).
[14]682 N.E.2d 45 (1997).
[15]*Trans States Airlines,* 682 N.E.2d at 55.
[16]*Id* at 46.
[17]*Id* at 47.
[18]*Id.*

claiming they were two separate products - and asserted that damage to the frame of the aircraft was damage to "other property."

Ultimately, the Court answered the "one product or two" question by holding that a product and one of its component parts *can* constitute two separate products.[19] The Court adopted the "product bargained for" approach, which requires an assessment of the injured party's bargained-for expectation.[20] The Court's assessment in *Trans States* was that, under the terms of the plaintiff's lease agreement, the plaintiff had "bargained for" a fully integrated aircraft.[21] The Court then reasoned that the plaintiff had not lost any more than it had bargained for. That meant that damage to the airframe - caused by the engine - was damage to a single product.[22] But the Court explained that had the plaintiff bargained separately for the engine and the airframe, damage to the airframe by the engine could be damage to "other property."[23]

We now look to the specific facts in this case. Defendant supports its contention that the aircraft was one integrated product, rather than separately bargained for units, by referencing plaintiffs' pleadings, a conversion chart created by JetProp, LLC (the company that converted the aircraft from a "Piper Malibu" to a "JetProp PA 46-500TP"), the new manual for the aircraft, which included a pilot's operating handbook and FAA flight manual, and finally the purchase agreement between JetProp and plaintiffs.

First, defendant points to plaintiffs' complaint where the allegations themselves state that the "subject aircraft was *converted* into a Piper DLXJetProp, PA-46-55TP by JetProp, and the "N"

---

[19] *Id* at 59.
[20] *Id* at 58.
[21] *Id*.
[22] *Id*.
[23] *Id*.

number was changed to N295S."[24] Defendant then notes that plaintiffs were expecting a fully integrated aircraft because they also allege that "JetProp had a duty to ascertain and insure that the various instruments, components, systems and assemblies, including the subject engine, were, in all respects, compatible for use in the subject aircraft."[25] Second, defendant provides a list of differences between the aircraft before - and after - the conversion. These differences are listed on the JetProp conversion chart and include variations in: horsepower, length of the aircraft, baggage capacity, fuel capacity, climb rate, max speed, and service ceiling. Because these changes go beyond the engine itself, defendant argues there was not simply an engine "swap."

Third, defendants refer to the new manual plaintiffs received after the conversion. It included a pilot operating handbook and an FAA approved Airplane Flight Manual. Defendant argues that the manual is not limited to the engine of the aircraft, and notes that it was required to be provided after the conversion. Finally, defendant refers to the agreement between plaintiffs and JetProp. That agreement lists 41 different equipment and parts that were to be switched out during the conversion. For example, the agreement lists, in addition to the "Pratt & Whitney PT6A-35 Engine," a "New Engine Mount System," a "Dual Battery Rack & Boxes," a "Heater Augmentor System," and a "Standby Ejector Vac System" to name a few.[26]

Because the engine was not the only item bargained for, as evidenced by the agreement and the new operating handbook, defendant argues that this case falls squarely within the findings in *Trans States*. There, the court held that the "proper starting point in the separate-products determination is the contract."[27] The language of the agreement between plaintiffs and JetProp makes

---

[24] Pls' Second Amended Compl., dkt. 303, ¶11 (emphasis added).
[25] Pls' Second Amended Compl., dkt. 303, ¶56.
[26] Pls' Second Amended Compl., dkt. 303, exh. B.
[27] *Trans States Airlines,* 682 N.E.2d at 50.

it clear that there was more to this purchase than simply an engine. And, as plaintiffs allege in their complaint, they bargained for not only the engine to be compatible for use in the aircraft but the "various instruments, components, systems and assemblies"[28] as well.

But plaintiffs argue that there is still a clear distinction in this case between the bargained for airframe - which they acquired in 2002 from another company - and the alterations that JetProp performed to the engine and other parts of the aircraft. Plaintiffs further assert that any time a product is repaired, the expectation will be that any new component will be integrated with the rest of the product. Therefore, plaintiffs do not believe the variations that occurred to the aircraft after JetProp's repairs were complete, as referenced by defendant, constitute a finding that plaintiffs "bargained for and received a fully integrated aircraft."[29]

We should note that plaintiffs next make the point that had they bargained for an aircraft, and not just an engine with a few additional parts, there would have been an Aircraft Bill of Sale. Plaintiffs cite, generally, to the Code of Federal Regulations and the section governing aircraft registration. We find no particular support for this argument and there is no response from defendant on this point. Defendants do, however, refer to the change in the aircraft registration number as support that the aircraft fundamentally changed. To this, plaintiffs simply compare it to changing a vehicle's license plate number: meaning there was no fundamental change to the item itself.

We find the most distinct difference between the facts here and those in *Trans States* is that the lease agreement in *Trans States* defined "the Aircraft." It was the "Airframe...together with the Engines initially installed on such Airframe... ."[30] From this, the court determined that the plaintiff

---

[28] Pls' Second Amended Compl., dkt. 303, ¶62.
[29] *See Trans States Airlines,* 682 N.E.2d at 50.
[30] *See Trans States Airlines,* 682 N.E.2d at 58.

had bargained for and received a fully integrated aircraft, and that the plaintiff had not bargained separately for an engine, and separately for an airframe. Here, the airframe was not a component part bargained for in the overhaul with JetProp.[31] As defendant points out, there was more than the engine that plaintiffs bargained for, but there is no evidence that they bargained for the airframe during this overhaul.

### B. Procedural Argument

Our inquiry now moves to the procedural argument raised by defendant. Defendant believes the spoliation claim must fail because plaintiffs abandoned their former products liability claim, which it argues is required to be decided concurrent with any spoliation claim. Plaintiffs first argue that the two claims are not required to be tried together under Illinois law. But plaintiffs also, alternatively, offer to amend their complaint and re-allege counts for products liability against defendant.

Both parties refer to *Boyd v. Travelers Insurance Company*.[32] There, the Illinois Supreme Court found that a spoliation claim "may be" brought concurrently with a products liability claim on which it is based, noting that a "single trier of fact would be in the best position to resolve all the claims fairly and consistently."[33] But the issue in that case centered on whether Illinois would recognize a cause of action for spoliation of evidence - finding in the affirmative - and whether a plaintiff had to first lose the underlying products liability action - finding that a single jury should be allowed to hear both claims concurrently.[34]

---

[31]*See ExxonMobil Oil Corp. v. Amex Const. Co. Inc.,* 702 F.Supp.2d 942, 970 (N.D. Ill. 2010)(finding that the property damaged was separate from any "component parts" bargained for in the construction project at issue, therefore, finding *Trans States* distinguishable).
[32]652 N.E.2d 267 (1995).
[33]*Boyd,* 652 N.E.2d at 272.
[34]*Id.* at 270-71.

Defendant, however, focuses on a specific discussion in *Boyd* where the court states that there cannot be an evidentiary presumption that the lost or destroyed evidence would have injured the party claiming the loss.[35] In other words, there may be situations where a plaintiff could prove its case through circumstantial evidence, thereby not having been harmed by lost or destroyed evidence. Or, there may be cases where the lost or destroyed evidence is not critical to the underlying suit. For these reasons, the court was clear to find that a plaintiff cannot "recover with an evidentiary presumption where it can be proven that the underlying suit is meritless."[36]

But nowhere does the court articulate that the underlying claim must be brought with the spoliation claim. To this point, plaintiffs refer us to an example where the Illinois Supreme Court, a year after *Boyd,* found that a spoliation claim could proceed without an underlying claim for medical malpractice. In *Miller v. Gupta* the court held that the lower court properly dismissed the plaintiff's medical malpractice count due to missing evidence.[37] It went on to explain that the appropriate remedy for the plaintiff was not through a medical malpractice action, but through a spoliation of evidence claim.[38] This was precisely because there was no legal avenue for plaintiff to file a medical malpractice claim without the missing evidence.

The concurring opinion further explained that because the plaintiff's underlying claim could not be adjudicated on the merits, in any action for negligent spoliation she would bear "the burden of establishing all the elements of that cause of action, including causation..."[39] A spoliation count can then, as in this case, be adjudicated without the underlying claim.

---

[35]*Id.* at 271.
[36]*Id.*
[37]672 N.E.2d 1229, 1232 (1996).
[38]*Id.*
[39]*Id.* at 1235.

But the distinction in that case was a court's determination that the underlying tort case could not go forward, albeit on a procedural basis, not on the merits.[40] We also acknowledge defendant's concern, as outlined by the *Boyd* court, the need to guard against plaintiffs "who may be tempted to manufacture a spoliation claim out of an insignificant piece of missing evidence because they know that they cannot win their underlying suit."[41]

Because plaintiffs have already agreed to amend their complaint to re-allege their products liability count against defendant, we find this to be the best remedy. This case then falls squarely in line with *Boyd,* as the "'watershed pronouncement on spoliation of evidence.'"[42] Proceeding with both claims, as the Illinois courts have reiterated after *Boyd,* is an important factor "'because a spoliator may be held liable in a negligence action *only* if its loss or destruction of the evidence caused a plaintiff to be unable to prove the underlying suit.'"[43] Damages are then determined by the trial court and the trier of fact "after a full trial on the merits."[44] Therefore, the negligence claim, once it is re-alleged, should proceed and then the spoliation count will be decided, which may survive even if the negligence claim fails.[45] But this ensures that should plaintiffs lose their negligence count, the trier of fact - having heard both claims concurrently - will know the "real reason why" the underlying suit failed.[46]

---

[40]*Miller,* 672 N.E.2d at 1232.
[41]*Id.* at 1234.
[42]*See Brobbey v. Enterprise Leasing Co. of Chicago,* 404 Ill.App.3d 420, 437 (1st dist. 2010)(*quoting Dardeen v. Kuehling,* 821 N.E.2d 227, 231 (2004)).
[43]*Id.* (*quoting Boyd,* 652 N.E.2d at 272)(emphasis in original).
[44]*Id.*
[45]*Id.*
[46]*See id.* (referencing *Boyd*).

### III. Conclusion

For the reasons set forth, defendant's motion for summary judgment on Count IV of plaintiffs' Second Amended Complaint is hereby denied [dkt. 327].

Date: 11/13/13                                    /s/ Susan E. Cox
                                                  U.S. Magistrate Judge